Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Tuesday, December 18, 2007 1:35:18 PM

# THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARTIN WILLIAM SMITH, and | ) | Case No. 06-1044 |
| REGINA MARIA SMITH | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| DONALD M. LENESKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 07-14 |
| v. | ) | |
| | ) | |
| MARTIN WILLIAM SMITH, and | ) | |
| REGINA MARIA SMITH | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

## MEMORANDUM OPINION

Donald M. Leneski, pro se, seeks to except a $6,500 debt from the Chapter 7 discharge of Martin and Regina Smith (the "Debtors") pursuant to 11 U.S.C. § 523(a)(6) on the grounds that the Debtors "criminally and maliciously destroyed" his residential rental property, by, inter alia, "defecating and urinating on new carpet." The Debtors deny undertaking any activity that would support Mr. Leneski's § 523(a)(6) cause of action.

The court held a trial in this case on November 8, 2007, in Martinsburg, West Virginia, after which the court took the matter under advisement. For the reasons stated herein, the court will deny the relief

sought by Mr. Leneski.

## I. BACKGROUND

On March 11, 2005, the Debtors and Mr. Leneski executed a residential lease agreement for a home located at 1504 Colebrook Drive in Virginia Beach, Virginia. The lease was for a period of two years, monthly payments were due in the amount of $1,300, and the Debtors gave both a $2,600 security deposit and a non-refundable $500 pet deposit. Under Paragraph 10 of the lease, the Debtors were "liable for any damages caused by . . . [pets] including carpet cleaning / replacement . . . ."

When the Debtors signed the Lease, they had two children, ages 7 and 3, two dogs (a golden retriever and a shitz-tsu), and photographs of the property depict cat related furniture. According to Mr. Smith, one of the dogs had two puppies during the lease term, which remained with the Debtors.

When the Debtors took possession of the property, they noted several defects with the condition of the house. Apparently, Mr. Leneski's previous tenant had damaged the premises, leaving some holes in the walls, and the house was generally dirty. On three occasions, Ms. Smith accompanied Mr. Leneski to court for the purpose of supporting his claims against his former tenant. According to Ms. Smith, she frequently complained to Diana Berning, a part-time property manager for Mr. Leneski, that the carpet had an odor smelling of cat urine, but Ms. Berning did not recall any of those alleged conversations, and Ms. Berning did not believe that the carpet had a repugnant odor when the Debtors moved in.

During the term of their lease, the Debtors made several improvements to the premises. Ms. Smith testified that she hired a professional cleaner to attempt to remove stains from the oven, and the Debtors, with the permission of Mr. Leneski, patched the holes in the walls themselves. The Debtors also build a deck and backyard fence with their own funds. In the words of Ms. Berning, the Debtors "did a beautiful job on the deck." Some of the other improvements the Debtors made to the property included hanging plywood in the garage for storage, and replacing broken receptacle covers. As Mr. Smith testified, "I was living there, I tried to make it nice." In fact, when Ms. Berning periodically visited the property before July 2006, she noted that Ms. Smith was a neat housekeeper.

In July 2006, Mr. Leneski made the decision to sell the property that he had leased to the Debtors, and their landlord-tenant relationship began to sour. Ms. Smith testified that she woke-up one morning to a for sale sign in their yard and a realtor lock-box hanging on the door. In connection with placing the

-2-

property for sale, Mr. Leneski, Ms. Berning, and a realtor made an inspection of the premises on July 20, 2006. At that time, Ms. Berning noted that the property appeared to be in good condition. According to Ms. Smith, when Mr. Leneski and Ms. Berning were on the property, she had all the kitchen cabinet doors off their hinges so that they could be sanded and then repainted. Ms. Berning testified that she did not specifically recall the cabinet doors being off, and she noted that the house appeared to be in good condition.

In August 2006, the Debtors failed to timely make their $1,300 monthly rental payment. Ms. Berning testified that during this time Ms. Smith was sick with multiple sclerosis and she related that Mr. Smith was also suffered from an illness. At trial, Ms. Smith explained that Mr. Smith had a bleeding ulcer, and she was fearful that he might die. On August 14, 2006, Mr. Leneski filed a civil claim for eviction based on the fact that the Debtors had not paid their August rent, and he sought damages for the missing $1,300 rental payment, a $360 late fee, and damages for "unauthorized repairs." The court hearing was set for September 1, 2006, and the Debtors failed to appear and defend the action. Although Ms. Smith claims that the Debtors never received official notice of the court hearing, Ms. Berning stated that Ms. Smith was supposed to meet her outside the courthouse on the day of the eviction proceeding to pay the rent. When Ms. Smith did not show, Mr. Leneski proceeded to obtain a judgment for eviction. According to Ms. Smith, she obtained two checks from her mother to pay the Debtors' rent (presumably for the months of August and September), but Mr. Leneski refused to accept the payment.

Regarding the civil claim for eviction, and the inconvenience of having their leased premises put up for sale, Ms. Smith admitted to calling Mr. Leneski an "S.O.B.," but she denied that she ever threatened to damage Mr. Leneski's property. According to Ms. Berning, however, sometime around the end of August 2006, Ms. Smith stated to her that Mr. Leneski was a "S.O.B." because her husband was dying of cancer, and Mr. Leneski was trying to put him and the Debtors' two young children on the street. Ms. Berning further related that Ms. Smith threatened on the telephone that she could either make it easy for Mr. Leneski to sell the property, or, she could make it "damn hard."

In his opening statements to the court, Mr. Leneski reported that he agreed to forebear from requiring the Debtors to immediately vacate the premises due to Mr. Smith's medical condition. Mr. Leneski felt some sympathy for the Debtors on account of the fact that he had a family member suffering

-3-

from terminal cancer. However, on Friday, September 16, 2006, Mr. Leneski caused the Sheriff to post a notice to vacate the premises – pursuant to the court order of eviction – no later than Friday, September 22, 2006. The Debtors, whom had not yet begun to move, began to pack up their belongings. As Mr. Smith testified, the Debtors had to leave the premises very quickly, and maintaining the house during this period was not a priority concern. On September 22, 2006, the Debtors were still moving out of the house when the Sheriff came to evict them. Numerous items of personal property still remained on the premises, and the Sheriff instructed the Debtors to either pile up those items on the curb, or to leave them in the garage. The Debtors complied with this request, and left the property without being able to turn the premises over to Mr. Leneski in a clean condition. Ms. Smith, however, stated that she did attempt to wash the carpet before she left, but she was only able to wash the bedrooms and part of the hallway before her attention was diverted to packing up the family belongings and moving. As a result of this washing, Ms. Smith reported, the carpet was damp.

After the Debtors eviction on September 22, 2006, Mr. Leneski took numerous photographs of the property. The photographs of the premises that were admitted into evidence depict an air duct full of dust, high grass in the backyard near the air condenser, a section of the backyard fence that was removed and leaning against the house, dirty living room carpet with pennies and other trash on the floor, carpet removed by Mr. Leneski showing moisture stains on the back of the carpet, trash piled up on the porch and on the ground, a garage floor full of miscellaneous items, appliances and mattresses stacked on the curb, a filthy oven, a leafy substance floating in a toilet bowl, and a large steel waste receptacle full of items that Mr. Leneski had removed from the property. Ms. Berning testified that the carpet reeked of urine and defecation, although she did not see any solid excrement on the floor. Ms. Berning also stated the it appeared as if there were wet urination stains on the walls. When Ms. Berning was in the property in July 2006, she did not notice similar stains or odors.

After the Debtors left the premises, Mr. Leneski sought damages against the Debtors in State court due to the condition of the property. At the October 5, 2006 hearing, Mr. Leneski showed the judge

photographs of the property, which, in the judge's opinion "spoke volumes."[1] No findings of fact were admitted into evidence from the State court proceeding. The only evidence of the State court proceeding that was introduced by Mr. Leneski is a summary disposition of the civil action showing that the State court entered a money judgment in favor of Mr. Leneski.[2]

Following the October 5, 2006 State court hearing, Ms. Berning stated that the condition of the property was such that Mr. Leneski was not able to relet it until June 2007. Before the property could be relet, the carpet was replaced, the floor was stripped and bleached, and Mr. Leneski ran an "ozone machine" in the house for a period of time in an attempt to rid the house of the urine smell.

Also, after the Debtors vacated the premises, Mr. Leneski learned of possible tampering with the house's HVAC unit. More specifically, on June 7, 2006, Mr. Leneski sent Hutchinson Mechanical to the premises to fix a frozen HVAC unit, and again on June 21, 2006 to address continuing problems. According to the June 21, 2006 invoice, the HVAC problems arose because the Debtors had set the house thermostat at 62 degrees during the evenings, when a proper setting should not be less than 68 degrees. Hutchinson Mechanical was called to the Debtors' house again on June 28, 2006, and it discovered that the unit was "overcharged." When Mr. Leneski relet the house in June 2007, his new tenant complained of high electric bills. Hutchinson Mechanical was again called to the house on August 20, 2007, and it discovered that the air conditioning system was 1½ pounds overcharged with refrigerant, and the heat sequencer was missing from the unit. Mr. Smith, who is employed as a HVAC technician, denies ever doing anything to the HVAC unit "damaging wise." He also stated that he was fairly regular in changing

---

[1] No transcript of the State court proceedings was entered into evidence. The State court judge's statement that the photographs "spoke volumes" was agreed to by both Mr. Leneski, and Mr. Smith.

[2] Because there were no findings of fact by the State court specifically stating that the Debtors wilfully and maliciously caused injury to Mr. Leneski's property, and because such findings were not essential to the judgment obtained by Mr. Leneski, the State court judgment is not entitled to any res judicata effect in this proceeding. *E.g.*, *Duncan v. Duncan (In re Duncan)*, 448 F.3d 725, 728-29 (4th Cir. 2006) (reciting that for res judicata to apply, the issues raised in the proceedings before the bankruptcy court must have been both litigated and necessary to the issues adjudicated in the previous, state court proceeding).

the air filters, and that he even replaced the heating element in the HVAC unit over the winter. Regarding the condition of the air filter when he left the house on September 22, 2006, Mr. Smith stated that changing the filter at that time was the least of his worries.

## II. DISCUSSION

Mr. Leneski contends that sometime between July 20, 2006, and the day of the Debtors' eviction on September 22, 2006, the Debtors decided to carry out Ms. Smith's alleged threat to make it "damn hard" for him to sell the property by wilfully and maliciously destroying his rental house in retaliation for his decision to sell the house and for initiating eviction proceedings against them. The Debtors, however, deny ever wilfully or maliciously injuring any of Mr. Leneki's property and expressed regret that they left the property in a messy condition, which, they assert, is only because they had seven days to vacate the premises.

Section 523(a)(6) of the Bankruptcy Code provides that a discharge in bankruptcy does not apply to any debt that arises from the "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a § 523(a)(6) cause of action, the plaintiff must prove by a preponderance of the evidence[3] that a debtor acted both willfully and maliciously in injuring the person or property of the plaintiff. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (holding that preponderance of the evidence standard applies to § 523 causes of action). The test is conjunctive; thus, a willful injury by itself is insufficient to support a cause of action unless the act was also done maliciously. *In re Miera*, 926 F.2d 741, 743 (8th Cir. 1991) (noting that willful and malicious are distinct elements of 523(a)(6) exception to discharge).

In this regard, § 523(a)(6)'s exemption from discharge is associated with the law of intentional torts, and conduct that is negligent or reckless remains dischargeable. *Kawaauhau v. Geiger*, 523 U.S. 57, 60 (1998). As stated by the Court of Appeals for the Fourth Circuit:

[Section] 523(a)(6) applies only to "acts done with the actual intent to cause injury."

---

[3] A "preponderance of the evidence" is defined as "[t]he greater weight of the evidence . . . [established] by evidence that has the most convincing force . . . . however slight the edge may be." *Black's Law Dictionary* 1220 (8th ed. 2004).

-6-

> Section 523(a)(6) is not satisfied by negligent, grossly negligent or reckless conduct. Moreover, the mere fact that a debtor engaged in an intentional act does not necessarily mean that he acted willfully and maliciously for purposes of § 523(a)(6). "[N]ondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."

*Duncan v. Duncan (In re Duncan)*, 448 F.3d 725, 728 (4th Cir. 2006).

Thus, for an injury to be "willful," the debtor must have intended the consequences of the debtor's act. More specifically, intentional conduct occurs when a debtor knows that the consequences flowing from the complained of acts are certain, or are substantially certain to occur. *E.g.*, *Barclays American/Business Credit., Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir. 1985) (adopting definition of "intentional" as stated in *Restatement (Second) of Torts* § 8A, comment b (1965)). For an act to be "malicious" the act must be targeted at the plaintiff, at "least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.* at 881. As defined by Black's Law Dictionary, a "malicious act" is "[a]n intentional, wrongful act performed against another without legal justification or excuse." *Black's Law Dictionary* 977 (8th ed. 2004). Because a debtor will rarely, if ever, admit to acting in a willful and malicious manner, those requirements may be inferred from the circumstances surrounding the injury at issue. *E.g.*, *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985) ("Implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6).").

In sum, for a debt to be excepted from a debtor's discharge pursuant to § 523(a)(6), the plaintiff must prove three elements by a preponderance of the evidence: (1) that the defendant's actions caused an injury to the plaintiff's person or property, (2) that the defendant's actions were willful, and (3) that the defendant's actions were malicious. In order to promote the notion of a fresh start in bankruptcy, these elements are construed strictly against the plaintiff and liberally in favor of the debtor. *E.g.*, *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 983 (3d Cir. 1997) ("[E]xceptions to discharge are to be strictly construed in favor of the debtor.").

In this case, Mr. Leneski alleges four different acts undertaken by the Debtors that caused damage: (A) leaving the house and its premises in a messy and disorderly state; (B) destroying the carpet; (C) removing the doors from the kitchen cabinets; and (D) tampering with the HVAC unit. All of these actions,

– 7 –

Mr. Leneski argues, were done in furtherance of Ms. Smith's alleged threat to make it "damn hard" for him to sell the house. The evidence, however, fails to establish that the Debtors carried through on Ms. Smith's alleged threat in a manner that would support Mr. Leneski's § 523(a)(6) claim.

### A.   Leaving the House and Premises in a Messy and Disorderly State

As demonstrated by the photographs taken by Mr. Leneski on the day of the Debtors' September 22, 2006 eviction, numerous items of personal property and household trash remained on the premises after the Debtors left. The grass in the backyard had not been cut, and from the photographs, appears to be between one and two feet high in certain places. Similarly, the kitchen oven was stained and generally filthy.

As stated by the Debtors, however, they believed that they could reach some accord with Mr. Leneski over their non-payment of rent notwithstanding Mr. Leneski's initiation of eviction proceedings against them. According to Ms. Smith, the Debtors attempted to tender their August and September rental payment to Mr. Leneski and remain in the premises, but that payment was refused. Also, according to the Debtors, they did not receive the first official indication that they were required to leave the premises until September 16, 2006, when the Sheriff posted the notice to vacate on their door. Although the Debtors could have begun the process of moving earlier, they did not, and under the circumstances, the Debtors essentially had seven days to pack up all their belongings and move to a new residence. As Mr. Smith stated at trial, he was sorry about all the trash, but he had to go.

Despite the fact that a large amount of trash remained on the premises, the evidence demonstrates that the Debtors undertook some effort to remove their personal belongings and move all the trash out of the house and into the garage or to the curb. On September 22, 2006, the Debtors were still attempting to clean out the house, and were instructed by the Sheriff to either place the remaining items on the curb, or in the garage. None of the photos taken by Mr. Leneski depict any substantial items of personal property remaining in the house.

Likewise, while the grass in the backyard was inappropriately high, the front yard appeared in the photographs to be reasonably well maintained. The backyard was enclosed with a high wooden fence – out of sight from the street – and was presumably used to corral the Debtors' dogs rather than for family activities.

Regarding the oven, Ms. Smith acknowledged that it was filthy, but she testified that the oven was already stained when she moved into the premises. Ms. Smith further related that she had hired a professional cleaner to remove the oven stains, but that attempt was unsuccessful. From the photographs, it appears that the oven stains built-up over a long period of time as a result of poor oven maintenance rather than as a deliberate attempt to damage the oven.

The evidence presented by Mr. Leneski only demonstrates that the Debtors left the premises in a sordid condition. At worst, the actions of the Debtors in failing to maintain the backyard, failing to remove all items of personal property and trash from the premises, and in failing to turn over a clean house were negligent, or even reckless, but the court cannot find, based on the evidence presented, that the Debtors actions were intentionally directed at Mr. Leneski in an effort to cause him financial harm, or that the Debtors' actions in turning over a messy house were in furtherance of the alleged threat made by Ms. Smith. Indeed, the Debtors' actions in attempting to remove all items of personal property from the home and in maintaining the front yard are inconsistent with the alleged threat. The costs incurred by Mr. Leneski in removing the trash, maintaining the backyard, and in replacing the oven are more consistent with ordinary landlord expenses following an eviction proceeding than with a malicious injury by the Debtors. *See, e.g.*, *Sanders v. Banks (In re Banks)*, No. 05-4384-659, 2007 Bankr. LEXIS 481 at \*3-4, 8-9 (Bankr. E.D. Mo. Feb. 12, 2007) (concluding that the debtor did not act maliciously when the debtor left the property "in disarray with hinges taken off several doors, several spots on the carpet, a broken window, . . . cabinets . . . off their hinges, paint splotches on the bathtub and [with] . . . trash left throughout the Property."); *Lilledahl v. Kibbee (In re Kibbee)*, 287 B.R. 239, 244 (Bankr. E.D. Mo. 2002) ("Although the Court empathizes with Lilledahl that his house was not left in good condition, the cost of repairing and cleaning up the premises is not the kind of injury contemplated by section 523(a)(6)."); *Sparks v. King (In re King)*, 258 B.R. 786, 797 (Bankr. D. Mont. 2001) (holding that leaving personal property and trash in a rental unit was not a wilful and malicious injury under § 523(a)(6), nor was the fact that the debtor punched holes in the walls with his fist when that act was not done with the purpose of causing harm to the landlord); *cf.*, *Selzer v. Alderson (In re Alderson)*, No. 03-4059, 2004 Bankr. LEXIS 154 (Bankr. D. Neb. Feb. 11, 2004) (finding a malicious injury to rental property when the debtor, *inter alia*, removed fixtures, damaged electrical wiring, pounded holes in walls, tore off wallpaper, spray-painted the furnace and other

appliances, and sawed-off a kitchen counter).

### B. Soiled Carpet

As testified to by Ms. Berning, the carpet in the house reeked of urine and defecation, and it was still wet on September 22, 2006. Much, if not all, of the carpet had to be replaced. Ms. Berning also observed what she believed to be urine stains on the interior walls. According to Ms. Smith, however, no one ever intentionally urinated or defecated on the carpet, and in fact, she had attempted to shampoo the carpet shortly before vacating, an activity which she undertook every two or three months.

Regarding the condition of the carpet, the court notes that the Debtors resided in the premises with two young children, four dogs, and possibly with at least one cat. Animals (and children too) inevitably will cause carpet to be maculated. The mere fact that carpet smells of animal urine and feces does not rise to the level of a wilful and malicious injury under § 523(a)(6). *E.g.*, *Delaney v. Carlyle (In re Carlyle)*, No. 06-4188, 2007 Bankr. LEXIS 193 (Bankr. W.D. Mo. Jan. 23, 2007) (holding that damage done by dogs and cats to property, and the stench of urine so strong that it made the landlord vomit, did not constitute a wilful and malicious injury by the debtor to the property of the landlord); *Norm Gershman's Things to Wear, Inc. v. Peterson (In re Peterson)*, 332 B.R. 678, 687-89 (Bankr. D. Del. 2005) (holding that allowing a dog to urinate and defecate on the carpet was negligent or reckless, but not willful and malicious; the evidence did not establish that the debtor deliberately made her dogs ruin the carpet in the last month of the lease term); *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 717, 725 (Bankr. N.D. Ill. 2002) (concluding that a debtor did not wilfully injure a landlord's property by allowing a dog to repeatedly urinate and defecate on the carpet).

The exact type of carpet damage that Mr. Leneski complains of was anticipated by the parties in their lease agreement. The Debtors gave both a $2,600 security deposit and a non-refundable $500 pet deposit. Under Paragraph 10 of the lease, the Debtors were "liable for any damages caused by . . . [pets] including carpet cleaning / replacement . . . ." The fact that Mr. Leneski exacted a nonrefundable $500 pet deposit, required a security deposit in an amount that was twice the Debtors' monthly rental payment, and required the Debtors to agree, if necessary, to replace the carpet when they moved out demonstrates that the parties anticipated that the Debtors' animals might ruin or damage the carpet during the lease term.

Regarding Ms. Smith's alleged threat to make it "damn hard" for Mr. Leneski to sell the property,

the court notes that Ms. Berning was in the Debtors' house in July 2006, at which time she did not notice that the carpet reeked of urine and defecation. Before July 20, 2006, Ms. Berning also noted that Ms. Smith was a neat housekeeper, and it is likely that Ms. Smith was diligent in picking up solid defecation and in attempting to clean up urine from the carpet, to the extent that is possible. Air fresheners can also mask the smell of urine. *E.g.*, *Carlyle*, 2007 Bankr. LEXIS 193 at *12-13 (odor of urine was obscured by air fresheners employed throughout the house during the tenancy). Ms. Smith also states that she washed some of the carpet before leaving, the dampness from which may have exacerbated the smell.

The inference urged by Mr. Leneski to support his claim of willful and malicious injury – that there were no urine or defecation odors on July 20, 2006, and that such odors had suddenly appeared as of September 22, 2006 – is too weak to demonstrate that the Debtors wilfully and maliciously locked their pets in the house for the purpose of having them urinate and defecate on the carpet in an deliberate attempt to cause destruction to the house in excess of their security and pet deposits. Animal urine and defecation are a normal part of the landlord-tenant relationship when a landlord allows a tenant to keep pets, and the fact that the Debtors' animals may destroy the carpet was specifically contemplated by the parties' lease agreement. The Debtors lived in the premises for about 1½ years with four dogs (two of which were puppies), possibly a cat, and two young children. Notably, as stated by Ms. Berning, she did not observe any solid defecation on the carpet after the Debtors left, and no recognizable defecation stains are noted on the photographs of the carpet taken by Mr. Leneski. While Ms. Berning speculated that there were wet urine marks on the walls, those spots are not depicted in the photographs taken by Mr. Leneski.

## C.     Missing Cabinet Doors

Mr. Leneski complains that the doors to the kitchen cabinets were removed by the Debtors and that this is evidence of the Debtors' wilful and malicious injury to his property.

Ms. Smith explained, however, that when Ms. Berning and Mr. Leneski visited the premises on July 20, 2006 – before their relationship had soured – the Debtors had taken the kitchen cabinet doors off their hinges for the purpose of repainting them. When the Debtors vacated the premises on September 22, 2006, the cabinet doors were still off their hinges. As explained by Mr. Smith, it took some time to sand each cabinet door down before they could be repainted, and his job required him to spend time out of town, meaning that he had a limited amount of time to complete the project. All the cabinet doors were

-11-

present in the house when the Debtors vacated, and the hardware was placed inside one of the cabinets.

Based on this evidence, the court concludes that the Debtors did not remove the cabinet doors for the purpose of wilfully and maliciously injuring Mr. Leneski's property; rather, the doors were removed with the intention of improving his property, and were not timely replaced. The Debtors' removal of the cabinet doors for the purpose of improving them, and their failure to timely replace the doors before they left the premises does not rise of the level of a wilful and malicious injury.

### D.     Damaged HVAC Unit

Mr. Leneski asserts that Mr. Smith, an HVAC technician, tampered with the property's HVAC unit by removing the unit's heat sequencer and by overloading the unit's refrigerant. Mr. Smith denies that he ever did "anything damaging wise" to the unit.

The evidence demonstrates that the Debtors were having difficulty with the house's HVAC unit in June 2006 – during the time when the Debtors and Mr. Leneski still enjoyed a relatively harmonious landlord-tenant relationship. Part of the HVAC problems arose from the fact that the Debtors kept the thermostat temperature too low while maintaining a high heat load in the house. All HVAC mechanical problems were apparently repaired no later than June 28, 2006, and it was not until sometime after a new tenant took possession in June of 2007 that Mr. Leneski became aware that more problems may exist with regard to the house's HVAC unit. According to Ms. Berning, the new tenant complained of abnormally high electric bills. When Hutchinson Mechanical inspected the unit on August 20, 2007 – nearly 11 months after the Debtors had moved out – they found the unit to be overcharged with refrigerant by 1½ lbs., and that the heat sequencer was missing. In contrast, when Hutchinson Mechanical inspected the unit on June 7, 2006, it found that the unit was low on refrigerant and the mechanic added ½ lbs. None of the earlier service calls noted a missing heat sequencer, meaning that the heat sequencer was most likely removed sometime between June 21, 2006 and August 20, 2007. The total cost for repairing the unit on August 20, 2007 was $493.00, and only $100.00 of that amount was related to the cost of parts.

After the Debtors left the premises on September 22, 2006, Ms. Berning testified that nobody lived in the house again until June 2007. While the house was vacant, Mr. Leneski ran an "ozone machine," replaced the carpet, and bleached and stripped the floors. No problems were noted by Ms. Berning with the HVAC until during the winter of 2006-07.

-12-

Given that the HVAC unit was having mechanical problems in June 2006, that the Debtors moved out on September 22, 2006, and that no problems were noted with the HVAC unit from September 22, 2006 to June 2007 – a time when the house was in the possession of Mr. Leneski – the court concludes that the inference that Mr. Smith wilfully and maliciously tampered with the unit is too remote to support a cause of action under § 523(a)(6), especially given the length of time between when the Debtors moved out and when the problems were noted by Hutchinson Mechanical. Indeed, if Mr. Leneski's allegation that Ms. Smith wilfully and maliciously tampered with the house's HVAC unit were true, it would be odd for an HVAC technician like Mr. Smith to only cause such minor damage.

### III. CONCLUSION

For the above-stated reasons, the court concludes that Mr. Leneski has failed to carry his burden of proof and/or persuasion that the Debtors willfully and maliciously destroyed his rental property as contemplated by 11 U.S.C. § 523(a)(6). The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021.